**DISSENTING and Opinion Filed March 26, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00719-CV

**JOSE HERNANDEZ, Appellant**

**V.**

**SUN CRANE AND HOIST, INC., JLB PARTNERS, L.P., JLB BUILDERS, L.L.C., AUGER DRILLING, INC., AND D'AMBRA CONSTRUCTION CORPORATION, Appellees**

**On Appeal from the County Court at Law No. 4**
**Dallas County, Texas**
**Trial Court Cause No. CC-15-00715-D**

## DISSENTING OPINION
Before the Court En Banc
Dissenting Opinion by Justice Bridges

I respectfully dissent from the Court's en banc opinion and judgment because application of controlling and long-standing precedent confirms that the trial court did not err in granting the traditional and no-evidence summary judgment motion of Sun Crane and Hoist, Inc., JLB Partners L.P., and JLB Builders, L.L.C., and ordering that Hernandez take nothing on his claims.

As the majority points out, there must be a nexus between a general contractor's retained supervisory control and the condition or activity that caused an

injury. *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357–58 (Tex. 1998). Despite this acknowledgement, the majority then retreats from any effort to anchor the claim in this case to any act of the general contractor. Instead, it eliminates the nexus requirement altogether; abandoning any analysis of contractual control, it fashions a new argument even the appellant is unwilling to make—that a "cluster of factors" signals "actual" control of the manner and means of the work Hernandez performed and thus constituted the means of his injury. Ignoring that neither the "cluster" nor any of its constituent parts have any demonstrable place in the proximate cause of Hernandez' injury, the majority cites a series of cases that reject both the majority's reasoning and its result.

In support of its actual control analysis, the majority cites not a single case that supports its position and cites only cases supporting this dissent. The majority opinion abandons the issue of contractual control and concludes a fact issue as to JLB's actual control is raised by JLB's retention of control over (1) the daily schedule,[1] (2) the order in which work was to be done, (3) the mandatory use of safety harnesses,[2] and (4) the timing of a crane's presence on-site. However, the

---

[1] There is no argument or legal analysis regarding scheduling in Hernandez' original brief or in his motion for rehearing.

[2] The majority opinion throws in "safety harness" language despite the fact that any discussion of safety harnesses would be appropriate only under a contractual-control analysis. There is no evidence of JLB's actual control relative to Hernandez' use of a safety harness on the day of the accident. Under supreme court precedent, a contractual requirement that the subcontractor must comply with specific safety procedures gives rise to only a narrow duty of care—"a duty that any safety requirements and procedures it promulgated did not unreasonably increase, rather than decrease, the probability and severity of injury."

majority makes no attempt to show the nexus between JLB's retention of control and Hernandez' injury. *See id.* The majority simply makes Hernandez' argument for him, asserting without support that its "cluster of factors" relate to Hernandez' injury and establish even a scintilla of evidence.

The majority's argument is, at each step, in direct conflict with Texas Supreme Court authority. In particular, the Texas Supreme Court has long held that neither a property owner nor a general contractor takes on the liability for injuries to a subcontractor's employee by insisting that the subcontractor adhere to safety protocols meant to reduce the risk of injuries to that subcontractor's employees. *See Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 611 (Tex. 2002); *Mendez*, 967 S.W.2d at 357–58. It has also held that neither a property owner nor a general contractor becomes liable in respondeat superior for "actually" controlling the manner and means by which work is done by being present at a job site or, while present, expressing concern about a possible safety risk to a subcontractor. *See Dow,* 89

---

*Hoescht-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 358 (Tex. 1998) (per curiam). There is no evidence that requiring the use of safety harnesses unreasonably increased the probability and severity of injury. On its face, requiring the use of "safety harnesses" seems unlikely to make construction work *more* dangerous. But more to the point, the majority cites no evidence that this contractual requirement unreasonably increased the probability and severity of injury to Capform's workers generally or Hernandez in particular. The only possibly relevant evidence mentioned in the opinion is Molina's affidavit testimony: "I yelled to the carpenters to jump off, but it was too late. They were tied onto the rebar cage with their safety harnesses." But that doesn't show that the safety-harness requirement unreasonably increased the probability and severity of injury to Capform's workers. *See McGill v. Minyard's Food Stores, Inc.*, 417 S.W.2d 309, 312 (Tex. App.—Dallas 1967, writ ref'd n.r.e.) ("[T]he mere happening of an accident is no evidence at all of negligence or proximate cause."). It doesn't even show that Hernandez' harness caused or worsened his specific injury, since there's nothing to show that he would not have suffered similar (or worse) injuries had he not been wearing a harness. There is no evidence that any party's safety procedures required a jump from a falling rebar tower.

S.W.3d at 608; *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 156 (Tex. 1999) (per curiam). Any contrary rule would increase workplace injuries and serve only to increase resulting litigation. Despite this supreme court precedent, a majority of this Court now holds that general contractors are liable for generally requiring that their subcontractors follow a safety protocol. General contractors may read this opinion as leaving them no option but to completely distance themselves from any efforts to assure safety on their work sites and wash their hands of safety standards altogether.

Whether we frame the issue in this case in terms of whether JLB exercised contractual or actual control over the work performed by Hernandez, this case is controlled by the Texas Supreme Court's decisions in *Dow Chemical Co. v. Bright*, 89 S.W.3d 602 (Tex. 2002) and *Hoescht-Celanese Corp. v. Mendez*, 967 S.W.2d 354 (Tex. 1998) (per curiam).[3]

*Dow* forecloses any possible basis for the claims in this case that appellants might be held liable under a theory of actual control merely because they directed the schedule and sequence by which the subcontractor's work was to be done. In *Dow*, an employee of an independent contractor hired to perform construction work for Dow attempted to hold Dow liable for injuries sustained on the job site. *Dow*,

---

[3] The majority takes umbrage at our panel opinion for failing to address two cases that were not cited in any brief on original submission: *Arredondo v. Techserv Consulting & Training, Ltd.*, 567 S.W.3d 383 (Tex. App.—San Antonio 2018, pet. pending), and *Morales v. Alcoa World Alumina L.L.C.*, No. 13-17-00101-CV, 2018 WL 2252901 (Tex. App.—Corpus Christi–Edinburg May 17, 2018, pet. denied) (mem. op.). These cases formed the basis of appellant's motion for en banc rehearing. The majority then goes on to state that neither its opinion nor the decision to reconsider this case en banc depended on those cases.

–4–

89 S.W.3d at 605. The employee asserted that Dow exercised actual control by retaining authority over the timing and sequence of work being done by the various independent contractors. *Id.* at 609. The court concluded there was no evidence in the record that Dow was involved in any manner with controlling the timing and sequence of the employee's work and deciding which of the independent contractor's employees should perform what task and at what point in time. *Id.* The employee did present evidence that the timing and sequence of the independent contractor's work was indicated on a job efficiency matrix prepared and submitted by the independent contractor and that, should the need arise, Dow and the independent contractor could mutually agree to a modification. *Id.* However, the court concluded this was not evidence that Dow controlled the timing and sequence of the erection of the pipe at issue and the employee's carpentry work in the area that resulted in the injury at issue. *Id.* The court concluded, therefore, that Dow did not exercise actual control. *Id.*

Likewise, *Mendez* forecloses any claim in this case based on any claim that appellants were actually controlling the details of the work. In *Mendez,* an employee of an independent contractor hired to perform various maintenance services at the Celanese plants sustained serious injuries when he fell from the shelf of a large metal tool box he was using as a ladder. *Mendez,* 967 S.W.2d at 355. The employee presented expert deposition testimony that, under the specific circumstances giving rise to his injury, the use of a ladder would have been safer and more appropriate

than a toolbox. *Id.* at 358. However, the court determined this was no evidence that Celanese's requirement that tools and implements be used in the manner for which they were intended was generally dangerous or unreasonable. *Id.* In conclusion, the court determined there was no evidence that Celanese exercised unreasonable care in insisting that the independent contractor comply with its safety standards. *Id.*

In this case, none of the so-called "cluster of factors" related to JLB's involvement in scheduling work, prioritizing work, or determining when equipment would be available establishes JLB controlled the timing and sequence of the events that caused Hernandez's injury or that JLB's actual control played any role in causing his injuries. *See Dow*, 89 S.W.3d at 609. Controlling precedent likewise confirms that an obligation to perform work according to a general schedule does not make the general contractor liable for injuries to a subcontractor's employees.

BACKGROUND

In October 2013, JLB entered into a Subcontract Agreement with Capform, Inc. regarding a construction project in Dallas. The subcontract provided JLB would pay Capform $11,583,000 for the work. On December 5, 2013, Alejandro Molina was Capform's foreman and Hernandez was a member of the work crew under Molina's supervision. Hernandez was injured when he fell from a "rebar cage" while attempting to place on the cage a concrete form suspended from a crane. According to Molina's affidavit, the crane operator "made the form strike the rebar

cage and cause[d] it to start falling over." Hernandez was injured in the fall, and he later sued JLB and asserted negligence claims.

In the Subcontract, JLB was listed as "Contractor," and Capform was listed as "Subcontractor." Among other things, the Subcontract provided the following:

> [Capform], at its expense, shall furnish all of the supervision, labor, material, tools, equipment, insurance, services, shop drawings, samples, protection, hoisting, scaffolding, supplies, warrantees and all permits, licenses and fees (as applicable) necessary to perform, construct, and complete, in the manner set out in the Contract Documents (defined below), the work described in EXHIBIT A of this Agreement (the "Work").

The Subcontract further provided that Capform was responsible for furnishing all equipment required to perform the Work including, but not limited to, ramps, ladders, scaffolds, hoisting and other equipment. An entire subsection of the Subcontract related to "Safety" and provided, among other things, the following:

> (1)  Compliance. [Capform] shall fully comply with all laws, orders, citations, rules, regulations, standards and statutes with respect to occupational health and safety, accident prevention, and safety equipment and practices, including without limitation, OSHA standards and any accident prevention and safety program sponsored by Owner or [JLB]. Without limiting the foregoing, simultaneous with the execution hereof, Subcontractor shall complete, execute and deliver to [JLB] an Accident Prevention Plan in the form set forth on EXHIBIT J attached hereto, and shall at all times comply with the requirements of EXHIBIT J and EXHIBIT K attached hereto.
>
> (2)  Precautions and Programs.
>
> (a)  [Capform] shall be responsible for initiating, maintaining and supervising all safety precautions and programs in its Work and shall conduct inspections to determine that safe working conditions and equipment exist.

(b)    [Capform] accepts sole responsibility for providing a safe place to work for its employees and for the employees of its sub-subcontractors and suppliers, and for the adequacy and required use of all safety equipment.

(c)    Prior to the commencement of the Work, [Capform] shall submit its site specific safety program to [JLB]. [Capform's] safety program must specifically address, among other safety issues, scaffolding, fall hazards, trenching and shoring, as may be applicable.

Regarding "Staffing," the Subcontract provided that Capform was "solely responsible for the acts and omissions of its employees, agents and suppliers and for the acts and omissions of its sub-subcontractors and their employees, agents and suppliers." The Subcontract further required Capform to keep a representative on the job site at all times when the work was in progress and provided that JLB "shall not issue or give any instructions, orders or directions directly to employees or workers of [Capform] other than to the persons designated as the authorized representatives of [Capform]."

Also, as the majority points out, the subcontract contained a production schedule set out in Exhibit D. Exhibit D contains a detailed description of the proposed work and allocates a number of days to each aspect of the work. The production schedule lists a series of steps in the construction process such as "Columns to B2" and assigns "12 days" to complete that step. All steps are given a range from one to thirty-one days. Nothing in the schedule assigns a timeframe for completion of less than a day. A series of lines beneath a calendar heading graphically represent the timeline of the proposed production schedule.

JLB filed a traditional and no-evidence motion for summary judgment in which it argued JLB did not owe a duty to Hernandez because he was an employee of an independent contractor and JLB did not have control over Hernandez. In particular, JLB argued it did not have a contractual right to control the means, methods, or details of Hernandez' work and did not exercise actual control over Hernandez' work. In support of its motion, JLB provided excerpts of the deposition of Juan Gutierrez, Capform's superintendent, who testified "no one from JLB has to tell us how to do the job," and Gutierrez is "the one who's in charge of what work that Capform employees are doing on a daily basis." Gutierrez testified he would have stopped the work if he thought anything was unsafe.

JLB also attached to its motion excerpts from Hernandez' deposition in which Hernandez testified JLB did not give him any instructions on how to set the form or the platform on the day of the accident. Hernandez testified Gutierrez was "supervisor," Molina was the foreman of the crew, and both Gutierrez and Molina worked for Capform. Molina told Hernandez he would be setting the platform on the day of the accident. Hernandez testified JLB did not tell him to set the platform or to get up on the tower that fell. Hernandez testified Molina taught him how to set the form or platform on the day of the accident, and JLB had no involvement in teaching him how to set the forms or platforms. Hernandez testified he did not see anyone from JLB "on this job on the day of the accident before it occurred." Hernandez replied, "I don't know" when asked whether he had any reason to believe

JLB caused the accident. When asked what the weather was like on the day of the accident, Hernandez said, "It was cloudy" and, when asked if it was windy, Hernandez answered, "No."

Attached to the response was the transcript of the deposition of Paul Johnston, JLB's chief operating officer. Johnston testified there were JLB employees "on the site on the day that [Hernandez] was injured, but there was no one there in the area where [Hernandez] was injured." Johnston agreed that JLB's employees who were of a supervisory level "were aware that these towers could be knocked over or fall over if not properly braced or if a big, strong wind came along or if the crane hit them."[4]

The question is whether the evidence created a genuine fact issue as to whether JLB owed a duty to Hernandez to keep him safe and breached that duty by permitting and instructing Capform to work under dangerous conditions.

Our review of the evidence concerning negligence begins with duty. *Lee Lewis Constr. Co. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). Ordinarily, a general contractor does not owe a duty to ensure that an independent contractor performs its work in a safe manner. *Id.* (citing *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999)). A duty does arise, however, if the general contractor retains some control over the manner in which the independent contractor performs

---

[4] This statement was a response to a hypothetical posed by Hernandez' counsel and not testimony of actual facts surrounding the underlying accident.

its work. *Id.* The general contractor's duty of care is commensurate with the control it retains over the independent contractor's work. *Id.* A general contractor can retain the right to control an aspect of an independent contractor's work or project so as to give rise to a duty of care to that independent contractor's employees in two ways: by contract or by actual exercise of control. *Id.* The majority concludes the record contains sufficient evidence JLB exercised actual control to defeat summary judgment. I disagree.

A contractor may assume a duty to its subcontractor's employees by actually exercising control over the subcontractor's work. *See Coastal Marine Serv. of Tex. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999). That means controlling the manner in which the work is done, such that the contractor is not entirely free to do the work its own way. *Koch Ref. Co.*, 11 S.W.3d at 155–56. But there is no evidence JLB actually controlled Capform's work on this occasion.

As the majority notes, a general contractor, "merely by placing a safety employee on the work site, does not incur a duty to an independent contractor's employees to intervene and ensure that they safely perform their work." *Id*. at 157. There must be an actual exercise of control, and that control "must relate to the condition or activity that caused the injury." *Clayton W. Williams, Jr. v. Olivo*, 952 S.W.2d 523, 528 (Tex. 1997).

The majority concludes that the record raises a fact issue on actual control in two ways. First, it says, "there is evidence JLB retained control over the daily

schedule, the order in which the work was to be done, the mandatory use of safety harnesses, and when the crane would be on-site." But these matters all concern JLB's supposed *contractual* right of control of when, not how, work was done. They provide no support for the premise that JLB personnel were that day actually controlling Capform's work activities at all, let alone the specific activities that led to Hernandez' accident.

Second, the majority asserts that "some evidence suggests there was sufficient wind that day to have made the work more dangerous and JLB knew of the wind and the increased danger." This is stretching the facts to make an argument for appellant. The majority uses the wind as a factor in reversing the trial court, but the facts before the trial court were as follows: JLB Partners' chief operating officer, Paul Johnston, was asked by Hernandez' counsel if JLB's supervisory employees "were aware that these towers could be knocked over or fall over if not properly braced or if a big, strong wind came along or if the crane hit them." Johnston answered, "Yes." Hernandez, in his response to JLB's motion for summary judgment, made frequent reference to "high winds," citing Johnston's quoted testimony.

We must look at what evidence was actually presented to the trial court. There is no evidence that JLB personnel knew either that it was windy or, more importantly, that the wind was exposing Capform's workers to increased danger. There was no evidence JLB knew of a "strong wind" at the time of the accident or that JLB supervisors ordered any specific work to be performed. Instead, this

–12–

testimony was entirely hypothetical and would have been the same if JLB's officer had been asked whether earthquake, tornado, or other overwhelming force had been applied to make the rebar tower fall. Further, there is no evidence that JLB employees were present when this work was going on or knew that wind was making the work unusually hazardous. Indeed, the evidence suggests it was not wind but an impact with a crane that caused the tower to fall.

There was no evidence that the wind caused the crane to hit the rebar tower or that JLB required Capform to work in windy conditions. In fact, Gutierrerz testified it "was possible there was some wind" on the day of the accident; he did not know "if it was a wind that was over 45 miles an hour"; the wind would affect a crew's ability to set a column if it was "above 20, 25 miles an hour"; but "[i]f it's less, it affects something, but it's – but we can – have to continue to work." There is no evidence JLB required the work to continue in windy conditions or that JLB was the party making the crew "have to continue to work." Thus, Gutierrez's testimony was that Capform would continue to work when winds were twenty-five miles per hour or less. Further, Hernandez himself, when asked at his deposition if it was windy on the day of the accident, answered "No." When Hernandez' affidavit was filed, there was no mention of wind in the affidavit.

As the majority acknowledges, actual exercise of control over safety can be shown with evidence that the general contractor personally witnessed and approved the safety procedures used by the subcontractor's employees. *See Lee Lewis Constr.*

–13–

*Co.*, 70 S.W.3d at 783–84. But there is no such evidence in this case. Nor is there evidence that JLB controlled the methods or operative details of Capform's work. *See Koch Ref. Co.*, 11 S.W.3d at 155. Here, there is simply no evidence that JLB had any actual control over preparing the worksite for the job Capform's work crew was doing when Hernandez was injured. Moreover, there is no evidence that any JLB employee told Capform or Hernandez how to do the task that Capform was doing when Hernandez got hurt.

The evidence showed Hernandez and Gutierrez, both Capform employees, testified JLB did not tell them how to perform any of the work that led to the rebar cage accident. Instead, Capform supervisor Gutierrez testified, "[N]o one from JLB has to tell us how to do the job." Hernandez testified JLB did not give him any instructions on how to set the form on the platform on the day of the accident.

Hernandez testified Gutierrez was "supervisor," and Molina was the foreman of the crew, they both worked for Capform, and Molina told him he would be setting the platform on the day of the accident. Hernandez testified JLB did not tell him to set the platform or to get up on the tower that fell. Hernandez testified he did not see anyone from JLB "on this job on the day of the accident before it occurred." Thus, there was no evidence that JLB exercised actual control that related to the injury the alleged negligence caused or that JLB specifically approved the dangerous act. *See Dow*, 89 S.W.3d at 607–09. Under the facts and circumstances of this case, I would conclude the trial court did not err in granting summary judgment for JLB.

–14–

Accordingly, I would not reach the breach and proximate cause issues addressed by the majority.


        /David L. Bridges/

        DAVID L. BRIDGES
        JUSTICE


Myers, Whitehill, Schenck, and Evans, JJ., join this dissenting opinion.


170719DF.P05